IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CASE NO. 5:13-CR-9 (MTT) |
| | ) |
| JOHN EDWARD BAKER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

Defendant John Baker, who has been charged with possession of a firearm by a convicted felon and possession of methamphetamine, has moved to suppress evidence gathered from his home. (Doc. 20). The evidence was obtained after law enforcement agents executed an arrest warrant for one Tiffany Gordon. At the time, Baker was a probationer. The terms of his probation included a warrantless search clause: "Defendant shall submit to a search of his/her person, property, residence, or vehicle at any time of the day or night with or without consent or search warrant, whenever requested by a Probation Officer or any other peace officer and specifically consents to the use of any contraband seized as evidence in a probation violation proceeding." (Doc. 21-1 at 1).

**I.  FACTS**

At some point prior to May 23, 2011, United States Deputy Marshal John Devenney was given an arrest warrant for Tiffany Gordon. (Doc. 32 at 6). Although the address on the warrant was 192 Silar Road, Gray, Georgia, Devenney, who has some history with Gordon, knew the address was probably the home of Gordon's mother or another family member and that Gordon never stayed at that address. (Doc. 32 at 18-19). Rather, Devenney knew that Gordon "goes from place to place." (Doc. 32 at 19).

On May 23, 2011, Devenney received a tip from a confidential informant that Gordon had been seen in the Hartley Bridge area of south Bibb County near two gas stations. Devenney testified that he used this informant regularly and had found the informant reliable.[1] Devenney also believed the tip to be reliable because Devenney had previously arrested Gordon at one of the gas stations where Gordon had reportedly been seen.

Devenney and his partner, United States Deputy Marshal Don Haney, went to the gas stations but no one there remembered seeing Gordon. However, when Devenney and Haney questioned employees at a motel across the street, they were told Gordon had been "hanging out" in one of the motel rooms. At that motel room, the deputy marshals found two men who said Gordon had been there earlier that day but had left. The deputies searched the room and confirmed Gordon was not there, but they found drug paraphernalia.

One of the men told Devenney that Gordon had been living in a house trailer with John Baker for a few months. The men offered to take the deputies to Baker's trailer. Devenney testified that he thought the two men were reliable because, again, Gordon was known to frequent the Hartley Bridge area and because he found a pocket book or a bag containing some of Gordon's personal belongings in a vehicle belonging to one of the men.

After arriving in the area where the trailer was located, the men agreed to enter the trailer and text or call Devenney to let him know if Gordon was there. When

---

[1] The Court denied the Defendant's request to require Devenney to disclose the identity of this informant. *See Roviaro v. United States,* 353 U.S. 53 (1957) (setting forth a balancing test to apply when determining whether the Government must disclose the confidential informant's identity); *United States v. Booker,* 131 Fed. App'x 234, 240 (11th Cir. 2005) (discussing *Roviaro* balancing test factors). As will be seen, the informant played a minimal role in the events.

Devenney received confirmation Gordon was in the trailer, the deputies and two other law enforcement officers approached the trailer.

Haney went to the front door of the trailer while Devenney went to a window on the right side of the trailer. (Doc. 32 at 8). The other two officers were stationed at other points around the trailer. After Haney knocked, Devenney, through the side window, saw several individuals, one of whom he believed to be Gordon, run to the opposite end of the trailer. (Doc. 32 at 8-9). Haney again knocked and Devenney knocked on the window and yelled "police." Because the glass of the window was the "thinnest" he had ever seen, Devenney broke the window as he knocked on it, cutting his hand. (Doc. 32 at 9).

Eventually, Baker came to the door. When asked if Gordon was in the trailer, Baker said she had been there earlier "but he thought she had left and there was no one else there." (Doc. 32 at 9-10). Because the deputies knew others were in the trailer, they placed Baker on the floor for "officer safety." (Doc. 32 at 10). After Baker had been secured, he gave the deputies his driver's license and told Devenney he was on probation.[2] (Doc. 32 at 10). Devenney stayed with Baker while Haney and the other officers looked for the other individuals. One of the officers, Brian Goggin, entered a bedroom while looking for Gordon where he found Gordon's identification card or driver's license on the bed.[3] (Doc. 32 at 76). Goggin looked in the bedroom closet to see if anyone was hiding there and saw a homemade safe and a silver pill box. (Doc. 32 at 78). Goggin said that he "opened up the silver container and I went um and I shut it back and that's all I did." (Doc. 32 at 78).

---

[2] It is unclear whether this occurred prior to Baker being handcuffed.

[3] Goggin's testimony suggests he thought or assumed all along that Gordon lived in the trailer. (Doc. 32 at 77-78). But the Government never established the basis for Goggin's belief or assumption. Accordingly, the Court gives no weight to Goggin's belief that Gordon lived in the trailer.

At some point, Devenney moved Baker to the trailer's porch and called to confirm Baker's probationary status. (Doc. 32 at 11). Eventually, the officers found Gordon hiding behind a washer and dryer unit and Haney brought her to the porch.[4] Meanwhile, the other officers continued looking for the other individuals who had run to the back of the trailer. (Doc. 32 at 16).

After confirming Baker's probationary status, Devenney asked Gordon whether there were guns or drugs in the trailer. (Doc. 32 at 13). According to Devenney, Gordon said there was a silver gun in the trailer. (Doc. 32 at 13). Devenney informed the officers Baker was subject to warrantless searches and that, according to Gordon, there was a silver gun in the trailer. (Doc. 32 at 15-16).

Gordon testified that she told Devenney a gun was in the trailer but said she was referring to a "long gun" that Baker kept in his room. (Doc. 32 at 92). She said the long gun was "like a rifle or a BB gun or something. You know, it was a gun that leans up against – that you could lean up against the wall is what I meant." (Doc. 32 at 93). Gordon testified that she thought Devenney asked her specifically about a handgun and that she did not recall telling him that a handgun was in the trailer. (Doc. 32 at 93). However, Gordon also said she could not recall what she told Devenney because she had been up for three days on methamphetamine and was "stressed out." (Doc. 32 at 92, 100) ("Oh yeah, I was up for three days. I was stressed out. And when you're all that and then you're hiding from the police."). (Doc. 32 at 100)). Gordon testified that she "played this over in [her] head so many times that everything is just kind of getting

---

[4] Devenney testified that he and Baker may have still been in the trailer when Haney came out with Gordon, but eventually Devenney, Haney, Baker and Gordon were on the porch together. (Doc. 32 at 12).

distorted," and that she "really don't know what is what honestly anymore." (Doc. 32 at 93).[5]

In his post-hearing brief, Baker argues the Court should credit Gordon's version of events, rather than the officers, because Devenney said she had a track record of reliability. "If Devenney's assessment is to be honored—and it is the only standard against which Ms. Gordon's reliability may be tested at all—then the object of the police's suspicion was a long antique gun or BB gun…." (Doc. 36 at 20). The Court tends to think Gordon's stressed out, sleep-deprived meth binge and her admission that she did not know "what is what honestly anymore" are also standards against which her reliability can be tested. Between Gordon and the officers, the Court credits the officers.

After Devenney told the officers about the gun, they conducted a search of the trailer. (Doc. 32 at 79). Goggin went back to the bedroom, opened the silver pill box, and discovered two small bags containing what appeared to be methamphetamine. (Doc. 32 at 79). After looking in the silver pill box, Goggin testified that he used a key lying on the bed to open the homemade safe. (Doc. 32 at 79). "When I opened it up there was a Taurus firearm,[6] some scales and some glass smoking pipes, and a high school diploma with Mr. Baker's name on it." (Doc. 32 at 79).

The Government also contends the search yielded a camera containing a picture of Baker holding the silver Taurus firearm. That picture was destroyed after being used during Baker's probation revocation proceeding. (Doc. 32 at 115-16). The Government

---

[5] Gordon further testified that, at some point, she had agreed to provide an affidavit to defense counsel to support Baker's motion to suppress. However, in response to Baker's counsel's question, Gordon testified she withdrew her agreement because:
> It freaked me out when y'all wanted – there were changes that had to be made. And then y'all wanted me to notarize a second sheet that didn't have any of the changes on it and it made me feel weird to notarize something that I didn't know I was notarizing….

(Doc. 32 at 97).

[6] Goggin also testified that the Taurus firearm was silver. (Doc. 32 at 79).

then obtained "a search warrant to go back into the camera to retrieve those pictures again that [it] knew existed from their initial retrieval by law enforcement." (Doc. 32 at 116).

In his post-hearing brief, Baker "requests an order barring the admission in evidence of: the pistol, the methamphetamine, the drug paraphernalia, the camera and its contents, as well as his statements, the federal search warrant and the evidence garnered from it, and any testimony about the police's observations of all of these things." (Doc. 36 at 5-6).

## II. MOTION TO SUPPRESS STANDARD

Motions to suppress evidence present mixed questions of law and fact for the court's determination. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (internal citations omitted). The individual moving for suppression of evidence bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed. *United States v. Ross*, 827 F. Supp. 711, 716 (S.D. Ala. 1993) (internal citations omitted). Once the movant has established a basis for his motion, the burden then shifts to the Government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified. *Tobin*, 923 F.2d at 1510.

## III. DISCUSSION

The parties' briefs have not been particularly helpful. The Government's briefs can be summarized in one sentence: As a probationer, Baker had a lowered expectation of privacy and, therefore, his motion must be denied. The Government does not respond to Baker's admittedly novel arguments and, more importantly in the Court's view, fails to advance, and thus has waived, one basis for denying the motion. Baker's post-hearing brief, on the other hand, runs the gamut of Fourth Amendment

jurisprudence.  Among other things, Baker argues that the "sparring" between his lawyer and the Government about his status as a probationer, the first blow of which was thrown by Baker in his motion to suppress and which continued through the first hearing to be the crux of Baker's arguments, was "misguided."  (Doc. 36 at 6).  Counsel were misguided, Baker argued in that brief, because his status as a probationer was completely irrelevant given that when officers arrived at his trailer, they did not know he was on probation.  For example, Baker said the Supreme Court's test for assessing probationer searches required that "the police … must actually be aware of the search condition when the search takes place.  *See [United States v.] Knights,* 534 U.S. [112] at 114-15 and 121."  (Doc. 36 at 18).  This argument surprised the Court.[7]  Consequently, the Court reconvened the hearing to learn more about this novel argument.  At the reconvened hearing, the Court understood counsel's position to be that although he can cite no authority holding that a probationer's lowered expectation of privacy is irrelevant when officers are unaware of his probationary status, he believes that should be the law.  For the reasons discussed below, the law is clear, in the Court's view, that the probationer's reduced expectation of privacy informs the *Knights* balancing test regardless of whether the officers know of the defendant's probationary status.

The Court's findings of fact raise essentially two events requiring Fourth Amendment analysis:  (1) the officers' initial entry into Baker's trailer to search for and arrest Gordon;[8] and (2) the officers' search of Baker's trailer after learning Baker was a

---

[7] It likely surprised counsel who appeared on behalf of Baker at the first hearing on Baker's motion.  After all, Baker's counsel then acknowledged that Baker's expectation of privacy was diminished because of his status as a probationer.  (Doc. 32 at 111).

[8] Arguably, it is only necessary to address the officers' entry into the trailer after they learned of Baker's probationary status because that is the entry that yielded all or most of the evidence at issue.  However, Baker makes a kind of "fruit of the poisonous tree" argument, contending that the initial entry somehow

-7-

probationer and that he had a gun in the trailer. The Court addresses those events first. The Court will then address three arguments advanced by Baker that do not directly relate to those events: (1) the officers illegally seized Baker's residence and its contents when they drove on the curtilage prior to the entry of Baker's home; (2) the officers illegally searched Baker's trailer when they surrounded the trailer and pounded on the doors and windows; and (3) the officers questioned Baker without reading him his *Miranda* rights. (Doc. 36 at 10, 12-13, and 16-17). The Court notes that the Government did not respond to these arguments.

### A. Whether the officers violated Baker's Fourth Amendment rights when they entered his trailer to search for and arrest Tiffany Gordon.

#### (1) Did the warrant for Tiffany Gordon's arrest authorize officers to enter the trailer?

As Baker properly notes, a search warrant is usually required to enter one person's residence to execute an arrest warrant on another person believed to be in that residence. *Steagald v. United States,* 451 U.S. 204 (1981). The Government responded that *Steagald* was inapplicable because Baker "was a probationer and as such had limited Fourth Amendment rights." (Doc. 33 at 6). That's a fair argument, but it overlooks a more basic argument suggested by the evidence – because there is evidence Gordon was living in the trailer, and regardless of Baker's probationary status, the officers did not need a search warrant.

In *Payton v. New York,* 445 U.S. 573 (1980), the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603. (emphasis added). In *United States v. Bervaldi,*

---

taints the second entry. While the Court disagrees, with one possible exception, the Court will address the reasonableness of the initial entry.

226 F.3d 1256 (2000), the Eleventh Circuit held that *Payton* requires a two-part inquiry to determine whether entry pursuant to an arrest warrant complies with the Fourth Amendment:

> In particular, we have held that "first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have reason to believe that the suspect is within the dwelling." Elaborating on this inquiry, we have explained that "for law enforcement officials to enter a residence to execute an arrest warrant for a residence of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." Furthermore, "in evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence." We believe such "common sense factors" must also guide courts in evaluating the first *Payton* prong.

*Bervaldi,* 226 F.3d at 1263. (quoting *United States v. Magluta*, 44 F.3d 1530, 1533-35 (11th Cir. 1995)). It is of no consequence that the arrest warrant lists a different address if the officers reasonably believe that the suspect is residing at a different residence at the time of entry. *Id.*[9] In any event, a suspect may have more than one dwelling for purposes of this analysis. *United States v. Bellamy*, 2010 WL 3610437, *4 (M.D. Fla.) (citing *Bervaldi*, 226 F.3d at 1263; *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009)).

The evidence here establishes that officers reasonably believed Gordon was in the trailer at the time of entry. The evidence also supports a finding that the officers reasonably believed the trailer was Gordon's dwelling at the time of the entry. Based on

---

[9] In *Bervaldi*, the officers knew the target of the arrest warrant used his parents' address as a permanent address, although the target actually lived elsewhere. Therefore, in light of their observation of the target at a different residence and statements he made to the officers that the address on the arrest warrant was his parents' address, the Eleventh Circuit concluded the officers had a reasonable belief that he lived at the other residence. *Bervaldi,* 226 F.3d at 1263. The primary question in *Bervaldi*—whether or not the target of the warrant was at the residence *at the time of entry*—is not relevant to this Court's analysis. It is clear the officers had reason to believe Gordon was within Baker's trailer at the time of their approach and entry.

his prior experience with Gordon, Devenney knew Gordon tended to move around.  The two men at the motel, who knew Gordon and had recently spent time with her, told the officers that Gordon was living in Baker's trailer.  These findings would establish that the officers' entry into the trailer to arrest Gordon complied with the Fourth Amendment's proscription of unreasonable searches.

If the Government had made this argument, the Court would rule, based on *Payton* and *Bervaldi,* that their initial entry did not run afoul of the Fourth Amendment.  However, the Court is not willing to deny Baker's motion on grounds not urged by the Government.

### (2) Given that Baker was on probation, did the officers violate his Fourth Amendment rights when they entered the trailer to search for and arrest Gordon?

Baker does not dispute that his expectation of privacy was reduced because he was on probation.  Still, he argues in his post-hearing brief that his status as a probationer was irrelevant because the officers did not know when they entered his trailer that he was on probation.  This argument has no merit.

In *United States v. Knights,* 534 U.S. 112 (2001), the Supreme Court evaluated the search of a probationer using the "general Fourth Amendment approach of 'examining the totality of the circumstances....'" *Knights,* 534 U.S. at 118 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).  However, a probation condition allowing searches would be "a salient circumstance" in determining the reasonableness of the search.  *Id.*

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." … *Knights' status as a probationer subject to a search condition informs both sides of that balance.*

*Knights,* 534 U.S. at 118-119 (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874 (1987)) (emphasis added).  The Court held that the balance "requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121.

In *Knights,* because the officers knew Knights was on probation, that fact, as the Supreme Court said, was relevant to both sides of the balance – the degree of intrusion into the individual's privacy and the degree to which the intrusion is needed to protect legitimate governmental interests.  Here, because the officers did not know when they first entered Baker's trailer that he was on probation, Baker's status, as applied to that entry, informs only one side of the balance, Baker's.  But nothing in *Knights* suggests, as Baker essentially argues, that a probationer regains his full expectation of privacy simply because the officers are unaware that he is on probation.  That would make little sense.  The entire premise of *Knights* and the cases that have followed *Knights* is that probationers have given up the expectation of privacy enjoyed by those who are not on probation.  It is illogical to suggest that a probationer's expectation of privacy ebbs and flows based on what the officers know.[10]  Moreover, the *Knights* balancing test appropriately accounts for an officer's ignorance of the probationer's status; obviously, the Government's strong interest in monitoring probationers is not a factor in the balance when the officer does not know he is dealing with a probationer.[11]

Thus, on Baker's side of the balance, because he was on probation, he did "'not enjoy the absolute liberty to which every citizen is entitled.'" *United States v. Carter*, 566

---

[10] The Seventh Circuit's decision in *United States v. Barnett,* 415 F.3d 690 (7th Cir. 2005) further illustrates this point.  In *Barnett,* the Seventh Circuit held that a probationer's search condition, as a matter of contract, grants consent to officers to search.  (No other circuit has adopted this theory.)  Having granted that consent by contract, surely that consent is not revoked simply because an officer is unaware of the probationer's contract.

[11] Baker's far down the slippery slope examples of rogue officers abusing the constitutional rights of citizens only to "luck out" when they happen upon a probationer bear no resemblance to the facts before the Court.  If such a case presents itself, then the appropriate remedy can be fashioned.

-11-

F.3d 970, 974 (2009) (quoting *United States v. Yuknavich*, 419 F.3d 1302, 1308 (11th Cir. 2005)).  Further, Baker had a probation condition requiring him to "submit to the search of his/her person, property, residence, or vehicle at any time of the day or night with or without consent or search warrant, whenever requested by a Probation Officer or any other peace officer."  (Doc. 21-1 at 1).  Because Baker's terms of probation broadly allowed warrantless searches, his expectation of privacy is further lowered.  *Id.,* 566 F.3d at 974-75 (search of probationer's home only required reasonable suspicion despite his "higher" expectation of privacy because his probation condition only required home visits by his probation officer).

On the Government's side of the balance, the officers were not, of course, protecting any interests related to probationers as the officers in *Knights* were.  However, they had an arrest warrant establishing probable cause to arrest a fugitive, they knew the fugitive was in Baker's trailer, and they believed her to be living there.  Clearly, arresting a fugitive served compelling government interests.  The Court concludes that entry into Baker's trailer to search for and arrest Gordon, if based on reasonable suspicion, was permissible given Baker's reduced privacy interest and the Government's strong interest in the arrest of Gordon.

"Reasonable suspicion consists of a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."  *United States v. Godsey*, 224 F. App'x 896, 899 (11th Cir. 2007).  The Court must examine the totality of circumstances and determine whether the searching officers had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Wilcher*, 2010 WL 5678676, *4 (N.D. Ga.).  The officer must "'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  *United States v. Boyce*, 351 F.3d 1102,

-12-

1107 (11th Cir. 2003) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)).

Again, when the officers arrived at Baker's door, they knew Gordon was inside and they had good reason to believe she lived in the trailer.  When Haney knocked on the door and yelled "police," Devenney saw an individual he thought was Gordon (along with other individuals) run to the back of the trailer.  Then Baker lied to the officers when he told them no one else was in the trailer.  Clearly, all this gave the officers sufficient reason to enter the trailer to arrest Gordon.  Accordingly, the Court finds that the officers' initial entry into the trailer to search for and arrest Gordon did not violate the Fourth Amendment.  Just as clearly, however, Goggin exceeded the scope of the officers' authority when he rummaged through the silver pill box.  Although Devenney, who clearly knew Gordon very well, said Gordon "possessed the capability to get small, real small when she hides," Goggin was not going to find her in that silver pill box. (Doc. 32 at 62).

> **B. Whether the officers violated Baker's Fourth Amendment rights when, after learning that he was on probation and believing he had a gun in the trailer, they searched the trailer.**

Baker also contends the second entry was not supported by reasonable articulable suspicion.  At the time of the second entry, it is undisputed that the officers knew Baker was on probation and subject to a warrantless search provision.  Also, the Court has found that Gordon told the officers there was a silver gun inside the trailer.

Thus, before the officers' second entry to search Baker's trailer, the officers knew Baker had been harboring a fugitive; they knew Baker had lied to the officers when he said no one else was in the trailer; they knew he was on probation; and they reasonably believed Baker had a weapon inside the trailer.  This information gave the officers sufficient reason to suspect Baker was engaging in criminal activity prior to conducting

the second search of his trailer. The Court finds the officers did not violate Baker's Fourth Amendment rights when they reentered the trailer to search for the gun. However, this conclusion does not resolve the issue of whether Goggin's unauthorized search of the silver pill box taints the drugs found during that search.

### C. Whether the officers illegally seized Baker's residence when they drove onto his property and when the four officers secured the area outside his trailer.[12]

Baker argues the "police seized Mr. Baker's home and its contents when they drove onto the curtilage and blocked all avenues of ingress and egress." (Doc. 36 at 10). Baker cites two factually distinguishable cases to support this argument. *See* (Doc. 36 at 10-11) (citing *Segura v. United States*, 468 U.S. 796 (1984) (entering and remaining inside the premises constitutes a seizure of the premises unless justified by a warrant or probable clause plus exigent circumstances); *United States v. Morales*, 868 F.2d 1562 (11th Cir. 1989) (same)).

First, the Court finds the land surrounding the trailer is not within the curtilage of Baker's residence. "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). The factors relevant to determining the boundaries of the curtilage are: (1) the proximity of the area claimed to be in the curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301. The first factor weighs in Baker's favor, as the land surrounding the trailer is next to the trailer's entrances. However, the area surrounding the trailer

---

[12] Because Baker's remaining arguments are easily addressed, the Court does so based on general Fourth Amendment principles and does not discuss the effect of Baker's lowered expectation of privacy.

was not enclosed or covered, and there is no evidence that Baker used it for any "home" type purposes, such as eating, cooking, or sitting. Further, there is no evidence that Baker protected the area surrounding the trailer with a gate, fence, or "No Trespassing" sign. The land surrounding the trailer was not part of the curtilage of Baker's trailer; thus, Baker did not have a reasonable expectation of privacy in that area.

Further, Haney was permitted to approach Baker's trailer and knock on the door, even though the front porch is usually considered the curtilage of a residence. "This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is only a semi-private area." *United States v. Lopez*, 2012 WL 1560648, *4 (S.D. Fla.) (internal quotations and citations omitted). "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Florida v. Jardines*, 133 S.Ct. 1409, 1416 (2013) (citing *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2001)). "In carrying out their duties, the police are free to go where the public would be expected to go." *Lopez*, 2012 WL 1560648, *4 (internal quotations and citations omitted).

Further, "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citing *Tobin*, 923 F.2d at 1511 ("Reasonable suspicion … can justify the agents approaching the house to question the occupants.")); s*ee also United States v. Knight*, 451 F.2d 275, 278 (5th Cir. 1971).

The Court has found no case suggesting that merely entering upon the person's property to approach and knock on the person's door constitutes an unreasonable seizure of the premises for Fourth Amendment protection purposes. Further, even if the

officers were required to reasonably suspect criminal activity prior to approaching the house, the officers had reliable information that Gordon—a fugitive—not only was living at Baker's residence, but also was present in the trailer at the time the officers approached. Thus, the officers did not illegally seize Baker's residence when they drove onto his property and approached his trailer.

### D. Whether the officers illegally searched the interior of Baker's residence when they surrounded the trailer and knocked on the doors and windows.

Baker also argues that any information gained by the officers when they surrounded the trailer constitutes an illegal search. Specifically, Baker refers to "Devenney's observations of a person he believed to be Ms. Gordon and Haney's observations of Mr. Baker." (Doc. 36 at 13). Baker cites *Florida v. Jardines*, 133 S.Ct. 1409 (2013) and *Arizona v. Hicks*, 480 U.S. 321 (1987) to support his argument.[13]

First, Haney's observation of Baker does not constitute an illegal search. Haney testified that he observed Baker from his position on the front porch. (Doc. 32 at 67). As noted, the front porch, unlike the other areas surrounding the trailer, is considered the curtilage of the home. *Jardines*, 133 S.Ct. at 1414-15. However, it is well established that law enforcement officers can enter onto residential property, including portions that would be considered part of the curtilage in order to carry out legitimate police business. 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.3(f) (4th ed. 2004). Further, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places where visitors could be expected to go (e.g., walkways,

---

[13] In *Jardines*, the United States Supreme Court held that a search occurred when police officers used a trained drug dog to explore the area around the defendant's home. *Jardines*, 133 S.Ct. at 1416. Further in *Hicks*, the Supreme Court held that a search occurred when a police officer moved equipment in order to see a serial number. *Hicks*, 480 U.S. at 324-25.

driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.  *Id.*; *Lopez*, 2012 WL 1560648 (citing LaFave for the same).

Similarly, Devenney's observation from a window located on the right side of the trailer does not constitute an unreasonable search.  In *Dunn*, the Supreme Court accepted the respondent's argument that a barn in an open field "enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant."  *Dunn*, 480 U.S. at 303.  But, because the law enforcement officers were lawfully occupying an area that was not afforded Fourth Amendment protections, the Supreme Court held that "peering" into the barn's open front door and even using a flashlight to assist their observations, did not constitute an unreasonable search within the meaning of the Fourth Amendment.  *Id.* at 304-305.

Moreover, there is nothing to suggest the Supreme Court's reasoning in *Jardines* or *Hicks* would apply here.  There is no evidence that Devenney moved a covering out of the way to observe the inside of the trailer through the window, nor is there evidence that Devenney used a trained drug dog to search the curtilage or even the land surrounding Baker's trailer.  Further, there is no evidence Devenney "engaged in more than naked-eye surveillance of the home."  *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (when an officer "uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a search.").  Thus, the officers did not illegally search Baker's trailer when they knocked on the door and looked in windows.

### E. Whether the officers were required to *Mirandize* Baker prior to questioning him regarding his name and his probationary status.

Baker contends that his statements to Devenney regarding his name and probationary status should be suppressed because he was not *Mirandized* prior to

being asked those questions.  It is unclear from the record whether Baker was handcuffed at the time he told Devenney his name and that he was on probation. Devenney testified:

> We placed Mr. Baker on the floor for officer's safety.  Because we saw or I saw several individuals take off and run once we knocked and announced.  And, at that point, I had asked him if he was on probation.  I'm positive – well, I'm pretty sure he had a driver's license that he handed me.

(Doc. 32 at 10).

The duty of a law enforcement officer to inform a suspect of *Miranda* rights arises when custodial interrogation begins. *See Miranda v. Arizona*, 384 U.S. 436 (1966).  The purpose of *Miranda* warnings is to prevent government officials from using "the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."  *Arizona v. Mauro*, 481 U.S. 520, 523 (1987).  "The *Miranda* procedures are intended to combat the effect which such a compelling atmosphere has upon the exercise of constitutional rights.  They are not meant to preclude law enforcement personnel from performing their traditional investigatory functions, such as general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process."  *United States v. Montos*, 421 F.2d 215, 222 (5th Cir. 1970) (internal citations and quotations marks omitted).[14]

Here, even if Baker was in custody for purposes of *Miranda*, he was not being interrogated by Devenney.  Devenney was simply engaging in on-the-scene questioning and performing his traditional investigatory function as a law enforcement officer.  At the time, Baker was not "under arrest" for a specific crime and had been handcuffed for

---

[14] *Bonner v. City of Pritchard*, 661 F.3d 1206 (11th Cir. 1981) (the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981).

officer safety concerns. Baker's rights were not violated by Devenney's failure to *Mirandize* him.

## IV. CONCLUSION

For the reasons discussed herein, Baker's motion to suppress is **DENIED** in every respect except with regard to the drugs discovered by Officer Goggin. The parties shall address that issue in supplemental briefs to be filed within seven days. Those briefs shall address only that issue.

**SO ORDERED,** this 14th day of August, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT